Good morning, Your Honors. My name is Douglas Gregory. I represent Electrostim Medical Services, Inc. Also, we commonly refer to it as EMSI. May it please the Court, I'd like to reserve five minutes of my time. This case tends to get complex over what really is a fairly simple subject. The overarching issue is whether the district court erred in dismissing with prejudice all of EMSI's claims. EMSI is a medical provider that provides a specific product, in this case in mainly TENS units, and the supplies to use those units. And it supplies those products by prescription from a physician or a chiropractor around the country. EMSI has worked with and used the defendant, Blue Cross Blue Shield of Texas, for many, many years, including during a time period prior to a contract being entered into when they were an out-of-network provider. Also, during January 2007, a provider contract was put in place that requires the payment for covered services, of which throughout the country the Blue's plans cover TENS units and the supplies. And it requires Blue Cross Blue Shield of Texas to pay according to a fee schedule, which is in this case basically a percentage of the charge, for all those subscribers for which it either insures or for plans it administers. And that can be both in Texas and out of Texas. And so the reach goes not just to those individuals that live in Texas or for product that was given and provided in Texas, but rather it imposes an obligation upon Blue Cross Blue Shield of Texas to administer plans that are outside its state. And it's your position that your client was not paid at all on some, and also that the payment rate claims are at issue. Correct. So both payment at all and payment rate are at issue. Well, both are at issue because there are roughly 13,000 claims during the contractual period, and there is approximately 20,000 claims that arise in the post-contract period. And EMSI, as we sit here today, do not always know what the adjudication, if any, had been made of some of the claims, because, frankly, some of the claims were never adjudicated by Texas. Do you dispute the District Court's conclusion that a number of those claims were incorrectly submitted to the Blue Cross Blue Shield entity that was a defendant in this case when, in fact, they should have been submitted to a different entity? Do you dispute that conclusion? I do, because I think what you're getting at, Judge, is during the time that the contract was in place, the claims were properly submitted to Texas, Blue Cross Texas. Then when that contract was terminated, August of 2010, EMSI continued to provide products and services to many of the same individuals, both living in Texas and elsewhere, that it was providing during the contract term. Those claims, which are roughly 20,000 post-termination claims, were in great respect submitted to other Blue Cross plans and returned. The reason they were submitted to other Blue Cross plans was because at that time, in the summer of 2010, Blue Cross Blue Shield National issued a policy directive that said, henceforth, we want all providers to submit their claims not to where they've been submitting them, not to who they have a contract with, necessarily, but the claims should go to the Blue's plan in the state where the product was delivered and the patient resides. So EMSI attempted to comply with that directive, and that's why it sent those claims to those states. Well, apparently, those states weren't in a position or weren't willing to start executing that policy. So they returned all of those claims unadjudicated. It was those claims that we then wanted to submit to Texas, and that the court, district court, ordered in a hearing in February 2013 that we submit those claims to Texas. That was then rescinded at a subsequent hearing in April 2013. I don't understand that. Can you explain that to me, why it was rescinded? Well, the court says at the hearing that because Blue Cross is simply going to deny the claims, that it really makes no sense to submit all of these claims. Didn't you need to tee up your breach of contract? It tees it up for you to be able to submit it to the right entity. Well, we wanted to submit it. We went to court with all the claims. So the fact that they might deny them doesn't mean that you shouldn't be able to submit them. That's exactly what we were saying. The fact that they might deny them at least then gets us to a point where, okay, we have an existing lawsuit in which we claim that these claims should be paid, and discovery can then go forward to address whether the claims were legitimately denied or not. Because at that point, you don't just have breach of contract. You also have quantum merit claims for services rendered, don't you? Well, I'm not sure that we have quantum merit. The court got into a discussion of quantum merit, and it appears as though I think they're right that we don't have a quantum merit claim, but that we do have claims potentially for breach of implied contract, breach of a third-party beneficiary. Okay, so even though you pled quantum merit, you're not seeking that relief from us in remand? Right. I think the court was correct in its quantum merit analysis that that would not apply. But the other claims, whether they be prompt payment, third-party beneficiary, implied contract, and a risk of— Why do you have a third-party beneficiary claim under Texas law? Pardon me? How do you have a third-party beneficiary claim under Texas law? It seems like your quantum merit is a better argument, but you don't have that. So how do you have a third-party beneficiary claim? The third-party beneficiary claim arises from the fact that there is a contract that exists between the patient and Blue Cross Texas or some other blues plan. We as a provider are a third-party beneficiary of that contract that allows us to submit— that then puts us in a position whereby we can submit claims for services and products provided to that patient and expect payment in return. Okay, but Texas law is clear that you're not—health care providers are not third-party beneficiaries unless you have specific facts that show in the contract that you were intended to be third-party beneficiaries. Isn't that correct? Well, I think that's correct, but I think that we do have specific— the court says that the controlling factor in determining whether a third-party may enforce a contract is the contracting party's intent. And I submit that we can allege, to the extent we have failed to allege the intent of the parties in allowing for non-participating providers, those without a contract with Blue Cross, to recover claims that we can allege an intent to ask between Blue Cross and the patients, the subscribers, to pay for services provided to that patient. Is it your position that you did allege or that you need leave to amend in order to allege? Well, that we—in this instance, that we need leave in order to allege. The court, as a third-party beneficiary, breach of implied contract and sued on an open account, actually set forth the allegations that need to be alleged to state a claim under—for those causes of action. I've got them written down here. I don't know that you want me to go through all of them. But we, EMSI, could go back on an amended pleading and make that allegation, and make those allegations and allege those elements. They all exist, and we could follow the court's directive on that. What is somewhat confusing is the court says in its order that they're going to dismiss all the claims with prejudice, even the breach of contract claim for the claims, going to dismiss all with prejudice because repeated attempts to amend have not been appropriate, and any further amendment attempts would be futile. Well, the truth of the matter is there was never repeated attempts to amend. We filed our original complaint, which was just a bare-bones complaint in state court. That then sat for approximately one year because the parties were working together to try to resolve various issues. When it became clear that that was not going to come to fruition, we then filed our first amended complaint in which we added additional causes of action. That was then answered, but Blue Cross also filed a motion to dismiss. But as counsel for Blue Cross admits, at the April 23 hearing, he states that the motion to dismiss that he filed was a very narrow one on the state and federal government issues only. That is indeed the case. There was 77 claims that arose out of state and governmental employee or retiree situations, and that was what they moved to dismiss. They even admitted to the court that they were not seeking a dismissal of the breach of contract claims, although they reserved the right to do that in the future if they thought it was appropriate, but they weren't seeking a dismissal of the breach of contract. So then the court, at a hearing on August 2, 2012, says, I'm not ordering that you put into the complaint a full list of claims. I think that's pleading evidence, but I am ordering that you at least be much clearer about the source and nature of the claims. That was the only discussion and the only reason for the dismissal of the first amended complaint. There was never any discussion of the other causes of action that had been pled and were existing. So we went back. We admitted the complaint. We added that, and in conjunction with that, the court said, I want you folks to exchange spreadsheets that gives the universe of claims, that gives certain information. So we indeed did that. We located and itemized on a spreadsheet with all the various information 13,000 claims. Blue Cross came up with 8,800 claims, but in any event, there's a substantial number of claims. Then after that was filed, which would then be the second amended complaint, they moved to dismiss that, again, relying largely not on breach of contract and arrest on the claims that had been pled, but rather narrowly focusing it on a few of the claims, which were what's known as the blue card claims, which were roughly 2,200 claims, and then the federal and state government employee claims. At the hearing on April the 23rd, which was a status hearing, so up until this time, no discussion with the court about any of the other claims, no discussion about having to amend that we haven't stated the causes of action for breach of contract. The court and everyone was just trying to get their head around what claims are we talking about, how many are there. Your time's expired.  Thank you, Your Honor. Thank you. You still have five minutes for Kavanaugh. Good morning. May it please the court, counsel. My name is Brian Kavanaugh, and I represent Healthcare Service Corporation, generally referred to by the acronym HCSC in the proceedings below. With my time today, I'd like to make three points. First, I would like to explain why this court should affirm the district court's exercise of its sound discretion in denying Electra Stem leave to file a fourth iteration of its complaint. Second, if this court affirms the district court's denial of leave to amend, based on claims that were conceded either in the district court or in briefing on appeal or waived by failing to argue any error on appeal, this court would only need to address whether or not the district court erred as a matter of law in dismissing the breach of contract in ERISA Section 502A1 claims pled in the second amended complaint. Third. There are also the claims of suit on account, unjust enrichment, the third-party benefit. Why would it be left with only the breach of contract in ERISA? Yes, Your Honor. The unjust enrichment, breach of implied contract, and quantum merit claims in Electra Stem's briefing, they can see that they're only challenging the district court's denial of leave to amend. They're not alleging that the district court or asserting that the district court erred as a matter of law in dismissing those claims in the second amended complaint. So our position is if you address the leave to amend issue and affirm the district court, then this court need only consider whether or not the district court erred as a matter of law in finding the second amended complaint failed to state a claim for breach of contract or for benefits under 502A1. The third point I wanted to make. Why did the court not err in not allowing them to amend on those? Because those hadn't been the subject of problems. You know, the previous amendments were based upon the contract claims for the most part, you know, what was deficient in that, and those hadn't been a focus. So how did they know that there was something wrong, and how were they given a chance? Your Honor, I believe that the chronology in this case is critical. This is not a typical situation or a situation in which the district court entertained motions to dismiss shortly after the filing of a complaint and then dismissed those claims without an opportunity. The parties litigated in federal court for two years prior to final dismissal of those claims with prejudice. Prior to that, the case had been pending, although these causes of action had not been asserted, for approximately a year, as counsel for Electra Stem noted. During the two years that the parties were before the district court, there were extensive conversations with the court and between the parties in an effort to just understand what claims are at issue and what Electra Stem's theory of recovery was. So I will concede that the briefing maybe didn't address in the motion to dismiss the first amendment complaint and some of these causes of action, but these issues were addressed with the court over and over and over again. Where is that in the record that would tell me that they were told ahead of time that there was a deficiency given a chance to cure and they failed to cure? Well, I think the court observed numerous times that the complaint that was filed was a bare-bones complaint. In fact, if we go back to the first amendment petition, the court— Okay, that's not—where were they told that there were specific deficiencies in the state law claims and given an opportunity to correct those? Well, they were told that in HCSC's motion to dismiss, at a minimum. They had an opportunity to seek leave to amend. They didn't do it. But how did they know that the court believed there was some deficiency? That's the question. I will say the court noted numerous times that there was an inability to understand from the face of the second amendment complaint what was at issue. Okay, that's— You're correct, Your Honor. The court did not say, you failed to plead quantum merit for X reason. Right, or you're not a third-party beneficiary because Texas law doesn't allow it for these three reasons. There's not that interchange on the state law claims because the whole focus seems to be the contract claims. I agree. I don't think the district court gave plaintiffs a roadmap as to how to properly plead their claims. Or told them that they were deficient. It gave them a chance to cure, such that dismissal with prejudice would be appropriate. I think the district court gave them ample notice that their complaint as a whole was deficient. She did not—you're correct, Your Honor. The district court did not get into detail on the specific causes of action. I believe the district court worked extensively with the parties to try to understand what claims were at issue. Is there something in the record you would want me to go back and look at in particular that would assuage any concern I would have with regard to the state law claims and their being dismissed with prejudice? With respect to the district court specifically addressing, for example, quantum merit or unjust enrichment? Well, he says he's not relying on quantum merit, but unjust enrichment, suit on account, third-party beneficiary. No, Your Honor. I can't point to something from the court prior to that point in time. That said, HCSC raised those issues in a motion to dismiss. In opposing that motion to dismiss, Electristim did not seek leave to amend. It never sought leave to amend once until after the district court dismissed those claims with prejudice. But I would add on the causes of action Your Honor just noted, the district court also found that amendment would be futile because of the nature of those claims. I'm not sure I get there, frankly, that they're futile. I think in order to— All of them. Sure. I think in order to understand that we have to divide the two universes of claims. So as to the 20,000 claims that were submitted to other Blue Cross Blue Shield entities, so not my client, not HCSC— According to Blue Cross's own procedure that you're supposed to submit in their state. Well, I think counsel said Blue Cross Blue Shield Association, which is a completely different entity than Healthcare Service Corporation. Right, but they had a policy and they were trying to follow that policy. Correct, but it's not HCSC's policy. So shouldn't they have a chance then to file them with the correct people? Your Honor, I don't believe that the district court entered an order that would, as a matter of race judicata, bar them from submitting their claims or suing another party on those claims. The only defendant in this case— Are you saying the district court did not discourage them from resubmitting those claims to the correct parties? No, the district court told—I don't believe the district court ordered them not to submit the claims. The district court observed that submitting them to us would be futile because they acknowledged they were not claims that had any connection to HCSC. After the contract was terminated, Electristim is providing goods and services to patients. The only right they would have to submit a claim to my client is as an assignee of those patients. They conceded that they submitted those claims to the entities they thought they were to submit them to. There's nothing in the record, there's nothing in the Second Amendment complaint that indicates that any of those claims relate to patients or beneficiaries of a policy of insurance issued by my client or a health care plan under ERISA that's administered by HCSC, which is why we raised the Article III standing issue. There's simply no connection between those claims and my client. To be sure, Electristim says they weren't paid, and if we assume that to be true, they have an injury, but they don't have a causal connection to my client. Counsel, we know that the, well, I guess the court ordered, the district court ordered the exchange of spreadsheets in connection with these claims. How much discovery, if any, was done aside from that in this case? There were discovery requests propounded, deadlines came and went, there was a motion to compel filed by HCSC, but at the end of the day, the only thing that got exchanged, for the most part, were those spreadsheets because I think the district court spent its time trying to work with the parties to come to an understanding of what, what are the, who are the patients and what are the services that you're suing on. And in essence, what we see here is Electristim, Electristim essentially wants to put every claim. Who propounded the discovery that got propounded? Both sides propounded discovery. All right. But to be clear, Your Honor, I don't believe the spreadsheets per se were directly responsive to a particular discovery request. That was something that the parties had exchanged in their own mediation discussions and which the district court encouraged further exchange of to help understand the universe of claims at issue. Did they ask for the EOBs and the contracts? And did they receive them before they were poured out on them? Did Electristim ask for EOBs and contracts? Yes. One of the criticisms that the court has is that they can't say in particular what the contracted service was. And their position is that without the EOBs and the contracts, they can't plead any more particularity, and that information is in your control, at least not in their control. I think that raises the question of whether or not they did what they were required to do before filing a lawsuit. They have an opportunity to get— Did they plead for the—can you answer my question first? Yes. Did they ask in discovery for these items, and did they receive these items in discovery before they were poured out, before they were dismissed? I'm sorry, I'm using a colloquial Texas phrase that I'm sure you're familiar with. I'd have to go find—I suspect—I have to imagine they would have asked for it, absolutely. They would have asked for it, and they did not receive it. Well, we also need to be clear that my client doesn't necessarily have that information. That's another problem here is that they're challenging coverage. If they want the summary plan descriptions and the plan documents, they need to get those from the plan administrator. That's not something HCSC is going to have. The vast, vast majority of claims in this case, it's a bizarre situation admittedly, but I think you heard counsel say that they're a Florida provider sending these TENS units all over the country. They obtained a contract with Texas based on a storefront that they had in Texas. Most of the claims in this case had nothing to do with Texas. They're administered by other Blue Cross Blue Shield entities. There may be active employer groups that are administering their own plans and using a Blue Cross entity solely for claims administration. We don't necessarily have that information. Do you have the EOBs? They have the EOBs too. Why? They said they don't have the EOBs. In their initial disclosures, they identified EOBs as one of the documents that they had and they would use to prove up their case. I thought they have some EOBs, but they're missing large quantities of the EOBs, which make it hard for them to plead with any more particularity. They are probably missing, well, I don't know whether they're missing them or not, but EOBs for the blue card claims are not something my client would have. If the claim is administered by a Blue Cross Blue Shield plan other than one under the umbrella of HCSC, then we wouldn't have the EOB. We don't hold the benefits. My client doesn't administer that plan. It is simply facilitating the processing of a claim. And I think that, again, it's important to draw a distinction between the— Does your client have the authority to deny the claim? On coverage, no. A blue card claim, on coverage, no. We don't make that determination. Here's a hypothetical. If ElectroStim ships a TENS unit to a patient who has their insurance with Blue Cross Blue Shield of Michigan or is a member of an employer-sponsored plan that's administered by Blue Cross Blue Shield of Michigan, let's say that Michigan patient actually happened to be physically within the boundaries of Texas and had received that unit there. They submit the claim to Texas. We process it, and this is for the period where they were a contracted provider. We process it, which means we forward it on to Michigan. Michigan then decides, based on its knowledge of the plan, is this a covered claim or is it not? And then it sends back that adjudication. So, no, HCSC, with respect to plans that are not administered by us, does not make that determination. So your client was not responsible for paying any of these claims? During the contract period, the check would have been issued if it was a covered claim and payment was allowed. The check would have come from Blue Cross Blue Shield Texas to its network provider, ElectroStim. So your client would have made the payments, even though you say that Michigan would have decided whether or not to pay? Pursuant to the Blue Card program, between the Blue's plans, the check would be issued by Texas, but Texas would not have financial responsibility for it. So you're saying they should sue Michigan, even though the check comes from you, your client? If we're talking about, well, pre-termination, if we're talking about a coverage determination, and we're talking about ERISA, I think ERISA requires them to name that plan administrator because that's the only person who's going to have the administrative record of why that decision was made. Well, don't they know that information? Don't you have to tell them, oh, it's really Michigan as your plan administrator, so then they can amend to bring them in, and you all have that information in your document retention area? Well, first and foremost, the EOB would come from Michigan. It wouldn't come from us, and so that would indicate it. Second, they have the patient's insurance information. They have their insurance card. They know it's Michigan, not us. Third, even if they didn't, and even if they – and by the way, we learned well into the case. One of the challenges with not having the information is they were using a third-party clearinghouse to do this, so they didn't have the claims information themselves. But even if they didn't have it ahead of time, and they should have, and they had the ability to get it, in the claims spreadsheet that we provided them as early as January 2012, all that information is right there on a claim-by-claim basis, and it's also in the claims spreadsheets that were filed under seal with the court in February of 2013. For every single claim, we identify what is the plan if it's not us. Is it Michigan? Is it Anthem? Is it California? Who is it other than Blue Cross? Is that in the appellate record? It is. I'll get you the reference. I believe the spreadsheets are at 953 and 954. Why is there such a discrepancy between the two of you on 13,000 versus 8,800? I can't say why they think they have 13,000 claims. We – They have it on their list, and you have 8,800 on your list, so why does the list not match? They don't have claims numbers on their list. They have patients' names and dates and things like that. But in terms of claims that were submitted to us, in January of 2012, HCSC queried its system and gave them a list of every claim that they had submitted to Texas in the time period at issue. They then handed back this spreadsheet with 13,000 or many, many more thousands of lines on it and did not have claim numbers. Did you go back and check those against your database of people that you provided services or sent? Yes. HCSC cross-referenced their list against the list that we had provided them in January of 2012, and that's what resulted in the 8,800 matches. And that was – those were the spreadsheets that the district court required us to file. We filed those under seal. And so what about those 8,800? Why don't they have a viable claim as to those 8,800? So as to the pre-termination claims, the 8,800, first, we believe their complaint alleged a claim only for the claims that we failed to pay, the denied claims. So for coverage reasons, number one, they don't allege anything in the Second Amendment complaint to indicate why they're challenging those determinations. So if it's an ERISA-governed claim, why are they challenging coverage? What element of the patient's plan entitles them to have that? Don't they have to know why you denied it before they can know why they're challenging your denial? And they have that information. How do they have that information? They receive that, well, in two ways. One, they receive a provider claim summary from HCSC that indicates whether the claim was – Is part of this litigation? No, no, no, no. The patient – Normal course of business. Okay. They wouldn't have received it. The patient would have received it, right? No, the patient would receive an explanation of benefits from their plan administrator. So if that was one of our plans, an HCSC plan, it would have come from HCSC. If it was Michigan or California or whomever, it would have come from Michigan or California. Then in addition to that, while they were a contracted provider, Blue Cross Blue Shield Texas would provide them what is called a provider claim summary indicating payment was being made or not being made. And does it say why not being made? And does it also say in the amount we're rejecting? Because they also have partial rate claims. They have payment rate claims in addition to payment failure claims, and I don't find that those are really dealt with in any detail. The provider claim summary has a series of codes on it that indicate why a claim is being admitted or denied, but I want to also direct the court to the contract. Just to make clear, then the patient gets the information, says your claim is denied because, and they're given a reason. The explanation of benefits that goes to the patient. To the actual patient, right? Yes, correct. But their company does not get that information? I don't know whether their company gets an EOB or not from all these other plans, but what they do get from Texas through the contract is a provider claim summary that has that information in a more summary fashion. It's not an ERISA adverse benefit determination with all of the content that that typically has to have, but it has other information. Then how can they know if they have ERISA claims? If they don't know why it's denied, and ERISA is very technical, and they don't know why it's denied, then how can they plead any more technically than they have? Well, they do know why it's denied, because the provider claim summary as well indicates whether or not a claim is denied based on coverage. I'd also like to direct the court. But why? What's wrong with the coverage? Is it that the person doesn't have a plan? They didn't pay their premium and they got fired at their job, or is it because the plan doesn't cover for this procedure unless you've had a referral from the right expert doctor? There are so many reasons, and so they need to know why so they can penetrate whether or not they have ERISA claims. Two things I would say in response to that for the pre-termination period, particularly given the court's focus on ERISA. Number one, there are vehicles that ERISA provides to get that information. If there's any ambiguity in their minds, if they truly are assinees, and by the way, there's nothing in the record that demonstrates they had a valid assignment to pursue those claims. This is not like Lone Star where the defendant is invoking ERISA to block state law claims. They brought claims as an assinee under 502A1. So number one, ERISA provides an avenue to get planned documents to get additional information. In addition, as a contracted provider with HCSC, the contract provides a claim reconsideration and appeal process. So if they have any questions, number one, they can log in online and get additional information, and number two, they can engage in a dialogue through that process. Counsel for Electra Stem conceded during one of the status conferences, and I can get the reference for the court, that Electra Stem never engaged in any appeal of any of its claims. So there are avenues through the contract and through ERISA to get that information before you come to the court and say, we want to put at issue every single claim and then let's sort it out in discovery and figure out which ones we have are valid and which are not. And that's precisely what Electra Stem said during the April 23rd, I believe, conference. It told the court, pardon me, told the court, well, if it turns out there's no coverage, then we can see that claim. That, I think that Judge O'Connor in the Northern District of Dallas in the Inova case correctly cited Iqbal in a very similar circumstance saying, you know, Rule 8 doesn't unlock the doors of discovery to a party that comes forward with just nothing but conclusory allegations, which is what we have in the Second Amendment. The problem is that they're not, they don't have to plead, I don't have heightened pleading under Rule 9. And the Second Circuit has spoken to this rather eloquently about when the information is in the control of the other party. Your position, though, is that it's not in the control of the other party. Is that? I see my time's up, but let me answer Your Honor's question. I see that it's, if the claim was, if coverage was determined by a party other than my client, then it may not be in our possession. In addition, they have avenues to get that information. It's not information that is exclusively in the control of the claims processor here, HCSC. They have it as, if they're an assignee of the patient with a proper authorization, they can get that information from the plan. But the case says that we have to, that they have to have done that before through the ERISA mechanism or through the other mechanisms. What case is that? Before they bring their lawsuit to get the information from y'all. Your Honor, I don't believe this is a settled issue in the Fifth Circuit. There are numerous district court opinions obviously holding that. We cite them in our brief, but the Fifth Circuit, you're correct, this court is not. We would be expanding Iqbal to rule your way. I don't believe you would, Your Honor. I think we're taking the simple principles required to state a claim for breach of contract or for ERISA. And again, the Fifth Circuit hasn't addressed it directly. But to state that you have an entitlement to plead a plausible claim for relief under ERISA, you need to establish that you had a right under the plan that entitled you to coverage for those benefits. You can't do that if you're not referencing the plan. And they had an avenue to get that information, multiple avenues to get that information before they filed suit. Thank you. Thank you. The truth of the matter is we did not get that claims information. We never were entitled to get any information as to what were ERISA plans and what weren't ERISA plans. Why didn't you get that? Because we asked for it in discovery. Why didn't you get it before the case ever started through the original review? Because we weren't entitled to get it. Why not? Because they won't disclose it. If you send a request and if you're talking about 10,000 claims, 13,000 claims, what's ERISA, what's not, Blue Cross Texas isn't going to be able to give you that information. I'm speaking across purposes here. I'm asking when the claim was denied, in the particular case, and you provided your unit to provide services for people, help someone, and then it's denied. At that point, ERISA does have a mechanism where you appeal through the ERISA process the denial. This was not done in any of these. So what's happened is instead of doing these as they come and are not paid, your client has waited, bundled them all up, and pursued them only in litigation. Tell me why that's not accurate. That's not accurate because in many instances we did not receive any explanation of whether a thing was denied or in some cases it was partially paid. So it's an underpayment thing. It doesn't evoke ERISA because it's a right to payment, rather an amount of payment issue. So ERISA doesn't preempt that. There's only a few situations where we ever saw anything that showed that a coverage determination was made and that it related to an ERISA plan. So we did not know when we received any information whether it was an ERISA plan or not. And, in fact, we were then – Did you make inquiries? Well, we did make inquiries, and we tried to get it also during the lawsuit, but the court abated discovery at the August 29, 2012 hearing and wanted the parties to focus on the spreadsheet information and actually abated discovery until further order. It wasn't until the April 23, 2013 hearing that she's indicated where she sets a new discovery process timeframe, says you guys need to get going on discovery because you need to get a lot of information. And then she says, all right, it seems to me what we ought to do is this. I will rule in the motion to dismiss, but if ERISA is an issue in this, then it seems to me that the most I could do would be to say – and I would limit the ruling, frankly, to those 3,000 claims. She's referring to those blue card claims and those federal and state employee claims. We don't even know anything about the other claims yet until you tell me differently. And if there is different, I'm eager to hear. But as to the 3 million and the 8,800 claims, it seems to me that the most I could say was that if there is an ERISA-governed plan, then coverage and eligibility determinations would be subject to ERISA preemption. Challenges based on rate of payment would not. Those would have to be subject to breach of contract analysis. We'd have to replead, but either way, we'd try the case. So that's the final hearing that we have prior to the court entering an order, dismissing with prejudice not only all of the breach of contract claims, but also all the ERISA claims. So because we had covered all of our bases in that regard, to the extent there are ERISA plans out there and it relates to coverage questions, then we have an ERISA cause of action. What is your best authority for the proposition that you can just say without support in your complaint that there are ERISA plans to which should have been paid without identifying the ERISA plan specifically? We alleged ERISA in the alternative, as we're entitled to do in a pleading, because we don't know what the ERISA plans are, and we know that the defendant removed the case to federal court based on ERISA, but until discovery is conducted, we can't know which ones relate to ERISA and whether it's rate of payment or coverage. What is your best authority for the proposition that you cannot know whether your claim relates to ERISA or whether it relates to a breach of contract, and that you can just plead it without any support and say, I'm going to wait to discovery to find out what claims I have and what amounts they are and who has to pay them under what authority? What is your best authority that in the Fifth Circuit that would be appropriate? Well, I think that under the Lorman case and Davila and under the third case that those set forth the ability of a health care provider to sue for claims that were underpaid or not paid at all or where coverage was denied, and that as that provider is sitting there filing its suit, it cannot know, for instance, what claims were subject to ERISA and what weren't. But oftentimes when you have a medical practice filing a claim, it's a very few claims. When you have someone like my client that does the type of business it is, contrary to what might be thought, we were not sitting around collecting claims and just collecting them so that we could then bring one suit and one big pile. Those claims were hitting every single day. And so even when the contract terminated, where there weren't so many claims that existed at the time of termination, they then became claims because slowly but surely the Blue Cross Texas was adjudicating those claims to some extent, be that not paying them, paying them partially, or simply not or tabling them. But at least we knew that the claims were not processed and that they were still out there and existing. Thank you, Mr. Rueda.  That concludes this panel's session.